## NORTH RANGE IRON CO. et al. v. MARQUETTE ORE CO.

### No. 8838.

Circuit Court of Appeals, Eighth Circuit.
Sept. 22, 1930.

A. McC. Washburn, of Minneapolis, Minn., and D. S. Holmes, of Duluth, Minn. (Oscar Mitchell, James G. Nye, Mitchell, Gillette & Carmichael, C. O. Baldwin, R. L. Mayall, and Baldwin, Baldwin, Holmes &

Mayall, all of Duluth, Minn., on the brief), for appellants.

E. W. MacPherran and Theo. Hollister, both of Duluth, Minn. (Abbott, MacPherran, Dancer, Gilbert & Doan, of Duluth, Minn., on the brief), for appellee.

Before STONE and VAN VALKEN-BURGH, Circuit Judges, and SCOTT, District Judge.

STONE, Circuit Judge.

This is an action by the Marquette Ore Company against the North Range Iron Company and three directors and officers of the latter company for damages on account of misrepresentation and fraud in the sale of an iron mining lease in Minnesota. One of the individual defendants (D. R. McLennan) was never served and made no voluntary appearance. As to another (Ward Ames), the court directed a verdict. The case was submitted to the jury as to the North Range Iron Company and as to Robert M. Adams (a director and secretary). From a judgment, entered on a verdict against both such defendants for $476,664.98, this appeal is brought by them.

The issues presented here are: I. Insufficiency of evidence; II. Submission of certain matters of fraud not supported by evidence; III. limitations; IV. laches; and V. waiver.

## I. Insufficiency of Evidence.

The North Range Iron Company was a corporation in which Adams, McLennan, and Ames were the controlling stockholders; McLennan being president, Adams being secretary, and all of them directors. Prior to this incorporation the above individuals had collaborated, as partners or otherwise, in mineral exploration of the land here involved. On August 30, 1919, the company was the owner of a mining lease upon a tract of land in Minnesota. Upon that day, it leased the mining rights therein to the Marquette Ore Company for a stipulated ton royalty. Thereafter, the Marquette mined the property. The alleged fraud was in connection with statements claimed to have been made by Adams (as the agent of the North Range, McLennan, and Ames) which induced the Marquette to enter into the above lease.

The statements charged to Adams were that he "represented to the plaintiff that the said co-partnership, and North Range Iron Company had done certain work of exploration and drilling and sampling upon the said premises, as aforesaid, and had made certain chemical and physical analysis of the bodies of iron ore then represented by him as said agent to be in or upon said premises and exhibited and furnished to the plaintiff certain maps, records, statements and data which he, the said Robert M. Adams, as special agent, represented as correctly and truly setting forth, showing and containing the results of said drilling, sampling and determinations, and falsely and fraudulently represented to the plaintiff that the said physical determinations and chemical analyses as set forth in said statements were correctly and properly made, and falsely and fraudulently represented to the plaintiff that the said drilling, sampling and chemical analyses done by said co-partnership and North Range Iron Company, were correctly done, and done in conformity with good engineering practice and standard, and in accordance with the standard method of chemical and standard development and mining practice."

The fraud in such statements was alleged to be that:

"The drilling of the ore body was done by what is known as churndrills, and the result of the drilling or sludge was deposited in a tank or receptacle known as a sludge-box, into which water was continuously introduced and caused to overflow from the sludge-box, carrying away a large part of the waste and worthless material in the sludge; whereas the drilling operation in the body of ore under consideration should have been done by the use of a drill in connection with a receptacle for the sludge or discharge from the drill, whereby the total amount of material taken out from the hole drilled could be saved, sampled and analyzed; whereas by the method pursued the total amount of material taken out of the hole drilled was not conserved and saved so as to permit a sample to be taken of the total amount of material that came out of the ground in the drilling operation, but on the contrary, a large amount of the material so taken out overflowed from the sludge-box and was washed away and lost and the remainder or residue in the sludge-box did not correctly show, and was not a fair sample of the ore body, but was in fact a sample of what was left after a very large proportion of the waste material had been washed out and carried away, thus making the work so done worthless and misleading as an indication of what the ore body actually was, whereby plaintiff was deceived and defrauded.

"Plaintiff further alleges on information and belief that a considerable number of the samples that were taken in the progress of the work were not analyzed at all and a very large number of the samples that were attempted to be analyzed were not analyzed by a qualified analytical chemist."

The loss was alleged to have occurred because "the said maps and data furnished to the plaintiff, as aforesaid, by the drilling, sampling and analyses shown thereon, indicated that there was on the said premises in the area so drilled and explored, approximately six million (6,000,000) tons of iron ore, which could be mined at a profit by good mining practice, a portion of which was direct shipping ore, and a portion of which was ore which could be economically treated or beneficiated and made into merchantable iron ore, of which ore three million (3,000,000) tons was open pit ore" but mining by plaintiff demonstrated that there was "in and upon said premises a tonnage of ore of such different character and so much less in amount, to wit, less than one million tons—than that indicated by the said maps, reports and data furnished to the plaintiff by the said defendants * * * and represented by the said defendants to plaintiff to be in and upon said premises, that it was impossible for the plaintiff, after the expenditure of moneys as aforesaid, to complete the work of development and the stripping and removal of the overburden from the open pit ore which was indicated to be in and upon the said premises, by said maps and data furnished to the plaintiff by the defendants, as aforesaid, to mine and remove from said premises any of the said open pit iron ore without loss."

There is no dispute that extensive mineral explorations were made by the three individuals and continued by the North Range. The answer admits that "in connection with said negotiations for a sublease samples and drill data were furnished to the plaintiff in accordance with the usual custom in negotiating mining leases in the State of Minnesota."

The explorations were by numerous drillings which took out cores of the material through which the drill passed. These cores were washed out of the drill casing and separately collected and are known as "samples." These samples were analyzed. The data thus secured was represented on a map showing the location of the drill holes and the result of the separate analyses.

It is undisputed that if the drilling, sampling, and analyses are properly done and such results correctly shown upon the map, a competent mining engineer can, from the map, make a fairly accurate estimate of the character, and amount of the ore body represented.

There is no issue here that the map did not truthfully represent the positions and results, as found by defendants, of the drillings. The issues are that the samples were not fairly taken and that the analyses were not representative, because "a considerable number of the samples" were not analyzed at all and "a very large number of the samples that were attempted to be analyzed were not analyzed by a qualified analytical chemist."

The court withdrew the issue as to the sludge-box and submitted two issues of fraud.

One of these was whether the representation that the analyses had been made by a competent person was fraudulent. The court instructed the jury that this issue involved two matters: (1) Whether Hugo F. Eimer (who made the analyses) was a competent chemist, and (2) whether Adams believed him to be such and had reasonable grounds for such belief.

The other issue was as to a statement in the prospectus that an examination of the samples "will show them to be absolutely uniform in regard to the silica therein." This issue involved whether plaintiff is barred by failure to examine the samples, which were there for that purpose.

### Analyses.

The analyses here in question are chemical analyses for the purpose of ascertaining the iron content. The contract for these analyses was with the Biwanago Iron Company. The charge of misrepresentation is that this analysis was made by an incompetent man and that Adams and Pearsall represented that the analyses were made by competent people. We think the evidence in each of these respects was not sufficient to justify the submission of that matter to the jury. These analyses were made by Hugo Eimer, who was not a graduate chemist and admitted upon the stand that he was not a chemist. He stated that he had received his instruction from a chemist who told him carefully how to make the analysis and gave him written instructions to be followed. This instruction continued for a month or more. Both sides concede that Lerch Brothers is a

competent chemical organization whose analyses are accepted by iron men. William J. Crawford, who was chemist in charge of Lerch Brothers' operations at Hibbing, testified that in their organization they have thirteen laboratories each in charge of a foreman with helpers under him; that neither the foremen nor helpers are graduate chemists as a rule and that the helpers are not really chemists but "analysts"; that the "analysts" are largely high school boys who are trained in their work either by men with long experience who have been in turn trained by a competent chemist or by himself, sometimes by the foreman. He says: "We take men into our laboratory as analysts who have had no previous chemical experience. With intensive training a man can be qualified in a month or maybe six weeks. One of the principle requisites is skill with the hands and care in handling the samples." Again, he says "chemical knowledge is ordinarily considered to be knowledge of what takes place in a chemical reaction and the operator does not need to know this in analyzing ore." Again, he says: "The various steps which I have described in running a sample for iron are mechanical and the requirements for a common operator are physical. If he has good eyesight, steady hands and is dexterous with his hands, he can get the result. It is our effort to reduce the process to a mechanical one as far as possible. In putting in potassium permanganate he must be able to recognize the first tinge of pink color and then stop, so that is merely a matter of eyesight and co-ordination." From the above, it would seem that Eimer might well have been qualified to make such analyses and he testifies that he made analyses only for iron and that this was done under the supervision of two men, who were chemists.

There is no testimony that Adams or Pearsall had any reason to believe that these analyses were not made in a proper manner.

Another matter in this regard is as to whether the analyses were accurate because, if they were, it would make no difference whether Adams thought they were or whether Eimer was qualified. The testimony of Crawford is that a variation of decimal point 3 in an iron unit might well occur between analyses by competent chemists in high grade ores; that it is more difficult to handle a low grade ore such as was found here in many places "because it is more difficult to mix the samples so that it is homogeneous. That is particularly so in a free silicious ore. This was a difficult ore to handle from that stand-

point. I have no basis of comparison so that I can determine with any degree of accuracy how wide the error might be in the analysis of different portions of the same large samples in this ore body." To test out the accuracy of Eimer's analysis, defendants had Crawford select about four hundred specimens at random from the samples of these drill holes. He made his analyses thereof without knowledge of the Eimer results on the same samples. A comparison of the Crawford and Eimer results show various divergences, the Crawford result being sometimes higher, sometimes lower, and sometimes very close to those of Eimer. The average of all of the Crawford results as compared with the average of all of the Eimer results shows a divergence of .55. Except as to some very low grade samples (all of which are below the washable ore contained in both analyses), the greatest divergences were less than three percent. Another experiment of this sort was by sending to Crawford portions from twenty-three samples from which he had already reported analyses without informing him of that fact. His second analyses of these samples showed divergences several of which were almost 2 per cent. and four of which were more than 2 per cent. and one of which was 5.73 per cent. Another experiment of this character was to have Crawford take portions of fourteen samples. This portion he divided; one part he analyzed, one part he gave to the O'Connell Laboratory, and another to the Graves Laboratory. In no instance were these three analyses identical, but they varied all the way from .10 per cent. up to 10.72 per cent. These tests conclusively show that the divergences between Crawford's tests and Eimer's are no more than might be expected and were not as much as were actually found in the fourteen samples submitted to the three companies.

As to this item of fraud, we think the proof was insufficient to show that the Eimer analyses were incorrect or that he was not qualified to make them, or that Adams or Pearsall had any reason to believe either that Eimer was not qualified or that the analyses were not correct.

### Silica.

The frauds submitted to the jury in this regard were statements in the prospectus regarding the structure of the ore as respects the character of silica. There is a very grave question as to whether this issue is within the pleadings. If it is, there was no sufficient evidence of fraud to authorize its submission to the jury.

The evidence is as follows: The importance of silica in this controversy does not depend upon its presence, but upon the character of its combination with the iron ore in the structure. If the silica is in a free form so that the process of washing will separate it from the ore, then a very low grade of ore—as low as 30 or 32 per cent.—may be concentrated by washing into a marketable ore of the required percentage. While if the silica is physically attached to the iron in such a way that washing will not separate it, then a much higher grade of ore—as high as 48 per cent.—would not be marketable. If the silica is combined in the latter form, it is called chert. Whether the structure is free silica or chert is not determined by a chemical analysis, but by certain physical tests to ascertain if it is of washable character or not. The churn drill breaks the formation up into very small particles, and therefore the samples taken from the drill holes afford little guide as to whether the formation is one or the other. The surest way of ascertaining this matter is by taking a sufficiently large quantity of the ore in place and having it tested. In this instance, defendants sank a shaft and ran a cross-cut from which they took over nine tons of ore. This shaft was sunk in the center of the supposed ore body which plaintiff's main witness (Pattison) said was the place where it would be expected to find the most representative specimen of ore. There is no challenge of the way in which this large sample was taken or that it was not sufficient in every way to be representative. This sample was turned over to the School of Mines of the University of Minnesota, which made analyses thereof and reported that the ore was free silica which could be easily washed. Apparently, also, microscopic test was made for this purpose, a microscopic test not being complete in itself, but being confirmatory of the other tests. Therefore, it would seem that the defendants had used every approved method of ascertaining the structure of the ore and that they were fully justified in accepting the report of the School of Mines and in making the statement, based thereon, contained in the prospectus.

### Conclusion.

We have not examined the other grounds urged by the defendants, such as limitations, laches, waiver, and improper evidence as to damages, because we think the total lack of proof of fraud is all determinative of the controversy.

We think there was a lack of sufficient evidence to submit any ground of fraud to the jury, and that, for this reason, the judgment should be reversed, and the case remanded for a new trial.